ORAL ARGUMENT REQUESTED

No. 25-2009

_____

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

LUCIA F. SANCHEZ; MICHAEL F. SANCHEZ JR.;
ERIK BRIONES; RICHARD JENKINS; and ROLAND RIVERA,
Plaintiffs – Appellants,

v.

RAUL TORREZ, in his official capacity as Attorney General of New Mexico;
RICHARD STUMP, in his official capacity as Chair of the New Mexico State
Game Commission; SHARON SALAZAR HICKEY, in her official capacity as
Vice-Chair of the New Mexico State Game Commission; TIRZIO LOPEZ, in his
official capacity as a member of the New Mexico State Game Commission;
GREGG FULFER, in his official capacity as a member of the New Mexico State
Game Commission; DR. SABRINA PACK, in her official capacity as a member of
the New Mexico State Game Commission; EDWARD GARCIA, in his official
capacity as a member of the New Mexico State Game Commission; FERNANDO
CLEMENTE JR., in his official capacity as a member of the New Mexico
State Game Commission; and MICHAEL SLOANE, in his official capacity
as Director of the New Mexico Department of Game & Fish,
Defendants – Appellees.

_____

On Appeal from the United States District Court
for the District of New Mexico
Honorable Kea W. Riggs, District Judge
Case No. 1:24-cv-00646-KWR-LF

_____

**APPELLANTS' OPENING BRIEF**

_____

CHRISTOPHER M. KIESER  MARK L. ISH
JEREMY TALCOTT    Felker, Ish, Ritchie, Geer &
Pacific Legal Foundation    Winter, P.A.
555 Capitol Mall, Suite 1290  911 Old Pecos Trail
Sacramento, California 95814  Santa Fe, New Mexico 87505
Telephone: (916) 419-7111   Telephone: (505) 988-4483
CKieser@pacificlegal.org   markish@felkerishlaw.com
JTalcott@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF RELATED CASES ................................................. viii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................... 1

INTRODUCTION ................................................................................ 1

STATEMENT OF THE CASE ............................................................... 4

    A.   The Landowners ....................................................................... 4

    B.   History of Privately-Owned Streambeds .................................... 5

    C.   *Adobe Whitewater* Declares Public Rights in Private Streambeds ............. 9

    D.   Executive Officials Enforce the *Adobe Whitewater* Decree ...................... 10

    E.   Landowners Sue State Officials Enforcing the Decree ............................. 11

SUMMARY OF THE ARGUMENT ...................................................... 12

STANDARD OF REVIEW ................................................................... 14

ARGUMENT ...................................................................................... 15

    I.   The Landowners Have Standing ................................................ 15

        A.   The Landowners Sufficiently Alleged Injuries-In-Fact ...................... 17

        B.   The Executive Officials' Enforcement Causes the Landowners' Injury ............................................................. 18

        C.   Prospective Injunctive Relief Would Remedy the Landowners' Injuries by Restraining Enforcement of the *Adobe Whitewater* Decree ........................................ 22

            1.   Relief against the state officials would relieve a discrete injury the landowners are currently suffering ........... 22

            2.   The district court's theory runs roughshod over the Supremacy Clause ....................................................... 28

II.   Sovereign Immunity Does Not Bar the Landowners' Takings Claims.........32

    A.    The Landowners' Prayer for Prospective Relief Does Not Implicate the State Treasury.................................................................33

    B.    The Landowners Do Not Have to Exhaust Remedies in State Court ..35

    C.    The Officials Are Not Entitled to Sovereign Immunity Under *Coeur d'Alene* .................................................................................38

III.  The Landowners Have Properly Alleged an Uncompensated Taking ..........42

CONCLUSION.................................................................................................45

ORAL ARGUMENT STATEMENT ....................................................................45

CERTIFICATE OF COMPLIANCE....................................................................46

ADDENDUM:  Memorandum Opinion and Order Granting Defendants' Motion to Dismiss, filed January 16, 2025

# TABLE OF AUTHORITIES

## Cases

*Adobe Whitewater Club of N.M. v. N.M. State Game Comm'n*,
    519 P.3d 46 (N.M. 2022) .............................. 2, 9–12, 14, 17–18, 22–24, 27–28,
    .............................................................................. 31, 33–34, 36, 42–44

*Armstrong v. United States*,
    364 U.S. 40 (1960) ...................................................................................29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................15

*Berger v. N.C. State Conf. of NAACP*,
    597 U.S. 179 (2022) .................................................................................19

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998) ...................................................................................19

*Bronson v. Swensen*,
    500 F.3d 1099 (10th Cir. 2007) ...............................................................19

*California v. Texas*,
    593 U.S. 659 (2021) .................................................................................31

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021) .................................................................2–3, 16, 31, 44

*Chamber of Commerce of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) .................................................................27

*Consumer Data Industry Association v. King*,
    678 F.3d 898 (10th Cir. 2012) .............................................................24–26

*Ex parte Young*,
    209 U.S. 123 (1908) .......................... 15, 18–21, 31, 33, 35, 37–41, 45

*Frank v. Lee*,
    84 F.4th 1119 (10th Cir. 2023) ................................................................19

*Georgacarakos v. United States*,
    420 F.3d 1185 (10th Cir. 2005) ...............................................................14

*Gerlach v. Rokita*,
    95 F.4th 493 (7th Cir. 2024) ....................................................................37

*Green v. Mansour*,
474 U.S. 64 (1985)................................................18, 29, 33

*Grove v. Groome*,
817 F. App'x 551 (10th Cir. 2020)..........................45

*Hartman v. Tresise*,
84 P. 685 (Colo. 1905).............................................7

*Heck v. Humphrey*,
512 U.S. 477 (1994)................................................19

*Hill v. Kemp*,
478 F.3d 1236 (10th Cir. 2007)..............................41

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015).................................................3

*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261 (1997)..............................13, 36–37, 39–41

*Knick v. Township of Scott*,
588 U.S. 180 (2019)................... 3, 15–16, 29–30, 35–36, 44

*Kolton v. Frerichs*,
869 F.3d 532 (7th Cir. 2017)...................................36

*Larson v. Valente*,
456 U.S. 228 (1982)................................................23

*Levin v. City & Cnty. of San Francisco*,
71 F. Supp. 3d 1072 (N.D. Cal. 2014)....................35

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)...........................................2, 44

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................18

*Massachusetts v. EPA*,
549 U.S. 497 (2007)....................................23, 25, 27

*Mitchum v. Foster*,
407 U.S. 225 (1972)................................................21

iv

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)..................................................................31

*North Mill Street, LLC v. City of Aspen*,
6 F.4th 1216 (10th Cir. 2021) ...............................................37

*Nova Health Systems v. Gandy*,
416 F.3d 1149 (10th Cir. 2005) .........................................25–26

*Obergefell v. Hodges*,
576 U.S. 644 (2015)..........................................................33–34

*Pavlock v. Holcomb*,
35 F.4th 581 (7th Cir. 2022) ..................................................20

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)...................................................................18

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) ............................................17–18

*S. Utah Wilderness Alliance v. Palma*,
707 F.3d 1143 (10th Cir. 2013) ..............................................14

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco*,
545 U.S. 323 (2005)................................................................16

*Sheetz v. El Dorado Cnty.*,
601 U.S. 267 (2024)................................................................44

*State ex rel. State Game Commission v. Red River Valley Co.*,
182 P.2d 421 (N.M. 1945) ..............................................6–7, 42

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Env't Prot.*,
560 U.S. 702 (2010)................................................................44

*Tarrant Reg'l Water Dist. v. Sevenoaks*,
545 F.3d 906 (10th Cir. 2008) ...............................................41

*Utah v. Evans*,
536 U.S. 452 (2002)................................................................27

*Va. Off. for Protection & Advocacy v. Stewart*,
563 U.S. 247 (2011)..........................................................18, 41

*VDARE Foundation v. City of Colorado Springs*,
  11 F.4th 1151 (10th Cir. 2021) ................................................................ 14–15

*Verizon Maryland, Inc. v. Public Service Commission*,
  535 U.S. 635 (2002) ...................................................................................... 40

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) ...................................................................................... 23

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................... 14

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980) ...................................................................................... 43

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ........................................................................................ 20

*Williamson County Regional Planning Commission v.
  Hamilton Bank of Johnson City*,
  473 U.S. 172 (1985) ................................................................................. 15, 35

**U.S. Constitution**

U.S. Const. art. VI ............................................................................................. 21

**Statutes**

28 U.S.C. § 1291 ................................................................................................. 1

28 U.S.C. § 1331 ................................................................................................. 1

28 U.S.C. § 2201 ................................................................................................. 1

42 U.S.C. § 1983 .................................................................................... 1, 13, 21

N.M. Admin. Code § 19.31.22.6 (2018) ........................................................... 9

N.M.S.A. 1978, § 72-1-1 (1907) ........................................................................ 6

N.M. Stat. § 17-4-6(C) (2015) ........................................................................... 8

## Other Authorities

Brady, Maureen E., *Zombie State Constitutional Provisions*,
2021 Wis. L. Rev. 1063 ...............................................................31, 34

Somin, Ilya, Knick v. Township of Scott: *Ending a Catch-22
That Barred Takings Cases from Federal Court*,
2019 Cato Sup. Ct. Rev. 153 ......................................................29–30

Stipulated Judgment After Remand, *Cedar Point Nursery v. Hassid*,
No. 1:16-cv-00185-NONE-BAM, ECF No. 39
(E.D. Cal. Sept. 1, 2021)....................................................................17

Treanor, William Michael, *The Original Understanding
of the Takings Clause and the Political Process*,
95 Colum. L. Rev. 782 (1995)...........................................................29

Vestal, Allan W., *Removing State Constitution Badges of Inferiority*,
22 Lewis & Clark L. Rev. 1151 (2018).............................................34

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are aware of no related cases within the meaning of 10th Cir. R. 28.2(C)(3).

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction under 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 1983 (federal civil rights cause of action), and 28 U.S.C. § 2201 (Declaratory Judgment Act). Appellants' claims for relief raise a federal constitutional question.

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court issued a final decision that disposed of all Appellants' claims. In a final judgment on January 16, 2025, the district court granted Appellees' motion to dismiss, holding that Appellants lacked standing and that their claims were barred by sovereign immunity. A timely notice of appeal was filed on January 27, 2025.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether five New Mexico landowners have standing to seek prospective injunctive and declaratory relief against New Mexico state officials enforcing a decree granting public access to their private, non-navigable streambeds.

2.      Whether the landowners' claims are barred by sovereign immunity.

3.      Whether the landowners have plausibly alleged that the officials' enforcement of the decree effects a taking of their right to exclude the public from their private, non-navigable streambeds.

## INTRODUCTION

A state may not decree public access to private property without paying just compensation. Such a decree amounts to an unconstitutional taking of the property

owner's right to exclude trespassers—"'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)). This appeal seeks only to establish that when a state deprives landowners of their federal constitutional rights, those affected may seek redress in federal court.

Erik Briones, Richard Jenkins, and Roland Rivera can trace their title along the Pecos River in San Miguel County back to before New Mexican statehood. App. 016–17 (Complaint ¶¶ 12–14). Along the Rio Tusas, siblings Lucia and Michael Sanchez's Rio Arriba County ranch has been in their family since 1942. App. 015–16 (Complaint ¶¶ 10–11). These streams are non-navigable, and the landowners hold title to the beds beneath them. App. 015–17 (Complaint ¶¶ 10–14). For decades, these landowners and their predecessors have had the right to exclude trespassers from walking and wading down their private streambeds. App. 021–24 (Complaint ¶¶ 32–41). All three branches of state government confirmed that right. *Id.*

But in 2022, the New Mexico Supreme Court decreed a public right to walk and wade across private streambeds. *Adobe Whitewater Club of N.M. v. N.M. State Game Comm'n*, 519 P.3d 46, 53 (N.M. 2022). The State Game Commission and the Department of Game and Fish immediately reversed their positions and began warning property owners not to exercise their right to exclude, while the Attorney General began targeting landowners—including Briones and Jenkins—with

lawsuits. App. 024–25 (Complaint ¶¶ 45–46), App. 053–66 (Briones suit); App. 139–50 (Jenkins suit).

To the landowners, their property is far more than a line in the sand—it is their livelihood. All are invested in conservation, stewardship, and the preservation of natural beauty. App. 015–17 (Complaint ¶¶ 10–14). Decreed public access suddenly rendered this impossible, as members of the public with little regard for the land, the fish, or the landowners' privacy could now walk on the private streambeds with the government's imprimatur. *See id.*; *see also* App. 026–27 (Complaint ¶¶ 50–53). So the landowners sued to stop state officials from enforcing the decree stripping them of their right to exclude without compensation. Yet the district court dismissed their complaint, holding that the landowners lacked standing and that the officials were protected by sovereign immunity. App. 170–86.

The district court's opinion would permit a state simply to re-characterize private property as open to the public with impunity. Those who see their long-established property rights stripped away without a penny of compensation would have nowhere to turn to assert those rights. This is akin to the catch-22 for property owners that the Supreme Court recently rejected in *Knick v. Township of Scott*, 588 U.S. 180, 184–85 (2019). Simply put, "[u]nder the Constitution, property rights 'cannot be so easily manipulated.'" *Cedar Point*, 594 U.S. at 155 (quoting *Horne v. Dep't of Agric.*, 576 U.S. 350, 365 (2015)).

3

For the reasons stated herein, the district court's judgment should be reversed and the case remanded to proceed on the merits.

## STATEMENT OF THE CASE

### A. The Landowners

Erik Briones, Richard Jenkins, and Roland Rivera own adjoining land along the non-navigable Pecos River in San Miguel County, New Mexico. App. 016–17 (Complaint ¶¶ 12–14). Rivera is a fifth-generation New Mexican whose great-great grandfather acquired a homestead patent from the United States government for 160 acres in 1888. App. 016 (Complaint ¶ 12). He inherited the 2.5-acre portion of that land that he currently owns in 2006. *Id.* Rivera maintains a small cabin on the land and uses it for recreation with his family. Jenkins purchased his family's 2.5 acres in 1984—the family uses it for recreation and fishing. App. 017 (Complaint ¶ 14). Briones bought his 27.5 acres out of the same original plot in 2023. App. 016 (Complaint ¶ 13). And over in Rio Arriba County, siblings Lucia and Michael Sanchez raise cattle on 80 acres they inherited from their father in 2018. App. 015–16 (Complaint ¶¶ 10–11). The non-navigable Rio Tusas runs through the land, which has been in the Sanchez family since 1942. *Id.*

While the landowners use their property for recreation and enjoyment with friends and family, they are also dedicated stewards of the land. All consider it their responsibility to help preserve the land's natural beauty and the rivers' place as

habitat for fish. App. 015–17 (Complaint ¶¶ 10–14). Briones, in particular, has invested substantial resources in stream improvements which have sustained a thriving habitat for trout and other fish in the Pecos. App. 017 (Complaint ¶ 13). The Sanchez siblings consider their ranch essential to their culture and their family's history—they have likewise invested in stream improvements that have made their land a better habitat for fish. App. 015–16 (Complaint ¶¶ 10–11).

The landowners all hold title to the streambeds beneath the non-navigable streams that run through their land. App. 015–17 (Complaint ¶¶ 10–14). In large part because many members of the public do not respect the land as they do, the landowners treasure their property rights, and especially their right to exclude trespassers from their land. *Id.*; *see also* App. 026–28 (Complaint ¶¶ 50–54). In the past, they have employed signs and fences to demonstrate that their portion of the streambeds were not open to the public. App. 023–24 (Complaint ¶ 41). They brought this case because New Mexico officials no longer permit them to exercise that long-held right. App. 024–25 (Complaint ¶¶ 45–46).

B.    **History of Privately-Owned Streambeds**

The private nature of the landowners' streambeds—contrasted with the public waters—is long established. Five years before New Mexico achieved statehood, the territorial legislature declared that "natural waters flowing in streams and watercourses . . . belong to the public and are subject to appropriation for beneficial

use." N.M.S.A. 1978, § 72-1-1 (1907); *see* App. 020 (Complaint ¶ 29). At statehood, this provision was incorporated into the state constitution as Article XVI, Section 2. App. 020 (Complaint ¶ 29). Under the equal footing doctrine, New Mexico took title to the beds of all waters within its boundaries which were navigable in-fact at the time, while the United States retained title in the beds of non-navigable waters. App. 020–21 (Complaint ¶¶ 30–32). The landowners' streambeds are beneath non-navigable rivers—three of them tracing their title back before statehood, while the Sanchez siblings trace theirs to a post-statehood federal land patent. App. 015–17 (Complaint ¶¶ 10–14). New Mexico never took title to these streambeds, so they remain privately held.

The conflict between private streambeds and the public waters provision came to a head in 1945. In *State ex rel. State Game Commission v. Red River Valley Co.*, 182 P.2d 421 (N.M. 1945), the New Mexico Supreme Court had to decide whether the owner of the streambeds had exclusive fishing rights to the water of two non-navigable rivers and a man-made lake. The three-justice majority held that the state constitution's public water provision "is merely declaratory of the prior existing law obtaining before New Mexico came under American sovereignty," such that the waters in question had always been public waters. *Id.* at 428–29. This rendered the *waters* open for fishing even where a private landowner holds title to the underlying land. *See id.* at 430–31. Two justices vigorously dissented—they would have

followed the Colorado rule adopted in *Hartman v. Tresise*, 84 P. 685 (Colo. 1905), which held that the owner of a non-navigable streambed had the exclusive right to fish in the waters. *See Red River Valley*, 182 P.2d at 446–47 (Bickley, J., dissenting), 456 (Sadler, J., dissenting).

But even as *Red River Valley* rejected the Colorado rule, it never established a public right to walk or wade on the streambeds. Instead, given an opportunity to clarify its opinion on a motion for rehearing, the majority rejected the notion that it had recognized public rights to trespass on private land. The court emphasized that "no person has the right to approach public water through private property, or fish in public water while on private property without the consent of the owner." *Id.* at 464 (opinion denying motion for rehearing). As the court explained, a member of the public "may fish in public water if he does not trespass upon the lands of another; and fishing in public water from a boat is not a trespass upon the property of the owner of the underlying land." *Id.* In short, under *Red River Valley*, the public nature of the water does not imply any right for members of the public to trespass on private streambeds to fish or recreate.

The Game Commission and the Department of Game & Fish consistently took the same position in annual proclamations. App. 022 (Complaint ¶ 35). For example, the 1991 proclamation contained a section entitled "Private Lands, Trespass, Stream Beds, Access" wherein the Department directed the public to "[o]btain permission

before fishing on private lands" and warned that "[n]othing in this proclamation will be construed to authorize entry into or onto any privately owned property, *including stream beds*, without the landowner's permission." App. 022 (Complaint ¶ 36) (emphasis added). The 1998 proclamation told the public to "obtain permission before entering into or onto private lands, *including streambeds*." *Id.* (emphasis added). Before 2022, neither the Commission nor the Department endorsed any public right to trespass on private streambeds. App. 022 (Complaint ¶ 35).

The state legislature further secured the landowners' right to exclude in 2015. Governor Martinez signed legislation that declared

> [n]o person engaged in hunting, fishing, trapping, camping, hiking, sightseeing, the operation of watercraft or any other recreational use shall walk or wade onto private property through non-navigable public water or access public water via private property unless the private property owner or lessee or person in control of private lands has expressly consented in writing.

N.M. Stat. § 17-4-6(C) (2015); *see* App. 022 (Complaint ¶ 37). The statute acknowledged the distinction *Red River Valley* drew between public water and private streambeds, explicitly referencing "wad[ing] . . . through non-navigable public water." N.M. Stat. § 17-4-6(C) (2015). Non-navigable public water is precisely what runs through the landowners' property under the *Red River Valley* framework.

Implementing the legislation, the Game Commission promulgated a regulation explicitly recognizing the landowners' right to exclude trespassers from their private streambeds. App. 023 (Complaint ¶ 38). Under the regulation, a landowner could apply to receive "a certificate and signage by the director and the commission that recognizes that within the landowner's private property is a segment of a non-navigable public water, whose riverbed or streambed or lakebed is closed to access without written permission from the landowner." N.M. Admin. Code § 19.31.22.6 (2018). *See* App. 023 (Complaint ¶ 38). A handful of property owners took the Commission up on its certification offer. One of them was Erik Briones' predecessor—a trust established by Kenneth and Julie Hersh. App. 023 (Complaint ¶ 39). Upon acquiring the property containing certified streambeds in 2023, Briones continued to display the Department-issued signs. App. 059–60.

### C.     *Adobe Whitewater* Declares Public Rights in Private Streambeds

Everything changed when several advocacy groups, led by the Adobe Whitewater Club of New Mexico, brought a mandamus petition directly in the New Mexico Supreme Court seeking to invalidate the Commission's regulation. App. 024 Complaint ¶ 42). Ultimately, the court agreed with the groups that the regulation was inconsistent with the state constitution's public water provision. Despite *Red River Valley*'s insistence that the public nature of the water did not enable trespass, *Adobe Whitewater* held that the state constitution guarantees members of the public the

right to walk or wade on privately-held streambeds simply by virtue of the existing public right to fish or recreate in public waters. *Adobe Whitewater*, 519 P.3d at 53. Therefore, it declared the regulation invalid.[1]

### D. Executive Officials Enforce the *Adobe Whitewater* Decree

The *Adobe Whitewater* court purported to rely on *Red River Valley*'s interpretation of the public water provision, but did not adhere to the limits of that decision. Instead, it declared for the first time that the public could trespass on the landowners' private streambeds, even as all three branches of the state government had previously confirmed that the landowners had the right to exclude trespassers. Executive officials quickly began enforcing the newly-declared public rights. The Game Commission rescinded its regulation and the Department of Game & Fish sent letters to property owners who had their streambeds certified, telling the owners that they could no longer assert their right to exclude through signs and fencing. App. 024–25 (Complaint ¶ 45).

The Attorney General has also aggressively enforced the newly-declared public rights. In an August 2023 press release, he announced a comprehensive effort to "ensure public access to rivers and streams in New Mexico." App. 017–18

---

[1] The court purported not to invalidate the 2015 statute on the ground that it was susceptible to a limiting construction that did not include streambeds—although it is not at all clear where one might "wade" if not in a river while walking on a streambed. 519 P.3d at 56–57. Nevertheless, the court undoubtedly swept away the right to exclude that the landowners and many others had held for decades.

(Complaint ¶ 15 & n.1). As part of that effort, he sued Erik Briones and Richard Jenkins for continuing to assert their right to exclude trespassers from their streambeds. App. 025 (Complaint ¶ 46), App. 139–50. His office has proclaimed that "it is prepared to take formal action to guarantee that all New Mexicans can access public waters for fishing and recreation." App. 029 (Complaint ¶ 61). As a result, anyone who continues to assert that their streambeds are closed to the public—the position of all three branches of state government before 2022—is under threat of an enforcement action.

### E.     Landowners Sue State Officials Enforcing the Decree

On June 25, 2024, the landowners sued Attorney General Torrez, the members of the Game Commission, and the Director of the Department of Game & Fish in the district court. App. 012–66. The landowners alleged that by implementing and enforcing the *Adobe Whitewater* decree without offering compensation, the state officials had effected an unconstitutional taking of the landowners' right to exclude the public from their private streambeds. App. 029–31 (Complaint ¶¶ 60–65). They sought prospective injunctive relief barring the state officials from taking any action to prevent the landowners from asserting their right to exclude, as well as declaration that the officials' assertion of public rights in the streambeds is an unconstitutional taking. App. 031 (Complaint ¶ 66, Prayer for Relief).

The district court granted the state officials' motion to dismiss, holding that the landowners' lacked standing and that the state officials were protected by sovereign immunity. App. 175. Although the court found the landowners' allegations that their right to exclude had been extinguished satisfied Article III's injury requirement, App. 175–76, it ultimately concluded that the landowners' injuries have not been caused by the state officials and that a ruling in the landowners' favor would not redress those injuries, App. 176–78. Additionally, the court held that only compensation would redress the landowners' injuries, which rendered any takings claim barred by sovereign immunity. App. 178–84.

The landowners timely appealed. App. 188–89.

## SUMMARY OF THE ARGUMENT

*First*, the landowners have standing. They have alleged that the New Mexico officials are actively enforcing public rights to walk and wade across their private streambeds that did not exist under state law until 2022. While the New Mexico Supreme Court decreed these new public rights in *Adobe Whitewater*, the landowners' injuries flow from the enforcement of the decree by the named executive officials without offering the landowners just compensation. The landowners seek prospective relief against that enforcement, not retrospective relief to undo the state supreme court's decree. Restraining state officials' enforcement of state law in such a way that deprives the landowners of a constitutional right is

12

precisely the purpose of the United States Constitution's Supremacy Clause and the federal civil rights cause of action recognized in 42 U.S.C. § 1983. Such relief would redress the landowners' injuries by restraining state action preventing the landowners from exercising their right to exclude trespassers from their streambeds. While an injunction would not bind every would-be trespasser in the state, the Supreme Court has never required such complete redressability to establish standing.

*Second*, sovereign immunity does not protect the state officials. The landowners sought prospective relief because prevailing law indicates that neither the state itself nor the officials can be sued for just compensation in federal court. Because the district court has the power to enjoin the state officials from following state law if the officials' actions deprive the landowners of their constitutional rights, a judgment in favor of the landowners would not require the payment of any state funds. Nor is there any other basis for sovereign immunity. While the landowners theoretically could have sought compensation in state court (where they'd be guaranteed to lose), they have a right to a federal forum for their federal takings claims. And because the landowners are private individuals who cannot contest New Mexico's sovereignty over the streambeds at issue, the narrow immunity doctrine the Supreme Court recognized in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), does not protect the state officials.

*Third*, the landowners plausibly alleged a taking. They alleged that New Mexico law before *Adobe Whitewater* uniformly recognized that property owners had the right to exclude trespassers from the beds of non-navigable streams on their land. Only since that decree have the state officials sought to enforce public rights without compensating the landowners. But the right to exclude is a fundamental part of the landowners' property rights that cannot be taken without compensation. A state cannot accomplish this result simply by declaring that private property is now open to the public.

## STANDARD OF REVIEW

This Court reviews de novo the district court's conclusion that the landowners lacked standing. *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013). "When evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, 'both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). That same standard applies to motions to dismiss on grounds of sovereign immunity and failure to state a claim. *See Georgacarakos v. United States*, 420 F.3d 1185, 1186 (10th Cir. 2005) (sovereign immunity); *VDARE Foundation v. City of Colorado Springs*, 11 F.4th 1151, 1158 (10th Cir. 2021) (failure to state a claim). To survive a motion to dismiss for failure to state a claim, the landowners need only plead

"sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *VDARE Foundation*, 11 F.4th at 1158 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)).

## ARGUMENT

## I.     The Landowners Have Standing

Two fundamental errors led the district court to conclude that the landowners lack standing to obtain any relief for the taking of their right to exclude. *First*, the district court misunderstood the operation of *Ex parte Young*, 209 U.S. 123 (1908), which permits individuals to seek prospective relief against state officials who deprive their federal constitutional rights. *Second*, and decisively, the court incorrectly assumed that to be sufficient under Article III, such relief must solve all potential problems the landowners might have exercising their right to exclude in the future.

Together, these mistakes deprived the landowners of the federal forum to which they're entitled to assert a deprivation of their federal constitutional rights. *See Knick*, 588 U.S. at 194. This case calls to mind the old regime of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985), where takings claims were confined to state court on the theory that "if the property owner failed to secure just compensation under state law in state court, he would be able to bring a 'ripe' federal takings claim in federal court."

*Knick*, 588 U.S. at 184. But in reality, property owners were shut out of federal court because of the preclusive effect of losing in state court. *See id.* at 184–85 (citing *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323 (2005)). Likewise here, the district court's standing analysis effectively resolves the case under state law, kicking the landowners out of federal court on account of the state supreme court's holding on a question of state law. As for property owners under the old *Williamson County* rule, "the guarantee of a federal forum rings hollow" for the landowners here. *Id.* at 185.

A proper standing analysis in this case must recognize that the landowners are here because no other relief is available. Their situation parallels that of the growers in *Cedar Point*, who sought relief against the enforcement of a California labor regulation even though the California Supreme Court had upheld the regulation against a takings challenge years earlier. *See Cedar Point*, 594 U.S. at 163–64 (Kavanaugh, J., concurring) (discussing the state court case). Unable to pursue that path, and unable to sue for inverse condemnation in federal court, the growers went to federal court and sought prospective injunctive relief. When the Supreme Court agreed with them that the regulation effected a taking, *see id.* at 149 (majority opinion), the federal district court enjoined state officials from enforcing the

regulation against them.[2] The landowners here seek the same relief for the same reason.

The landowners were not parties in *Adobe Whitewater*. Like the growers in *Cedar Point*, they are entitled to bring their takings claims in federal court even after the state supreme court rejected those arguments from others. And they're entitled to do so against these officials because the officials are the ones enforcing the taking. For the reasons that follow, the district court erred in concluding that the landowners lack standing to seek prospective injunctive and declaratory relief against the Attorney General and other state officials enforcing the *Adobe Whitewater* decree.

## A.   The Landowners Sufficiently Alleged Injuries-In-Fact

Begin with what the district court got right. The court correctly found that the landowners "suffered an injury in fact" and "may seek prospective relief against enforcement because each is confronted with a credible threat of prosecution." App. 175. The allegations that Attorney General Torrez had targeted two of the landowners with enforcement were enough for the landowners to clear "the first standing hurdle," as it is far from speculative that the Attorney General will target the other landowners if they obstruct public access to their streambeds. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110–11 (10th Cir. 2024).

---

[2] *See* Stipulated Judgment After Remand, *Cedar Point Nursery v. Hassid*, No. 1:16-cv-00185-NONE-BAM, ECF No. 39 (E.D. Cal. Sept. 1, 2021).

From there, however, the district court veered off course.

**B.    The Executive Officials' Enforcement Causes the Landowners' Injury**

"The second standing element, causation, requires 'a causal connection between the injury and the conduct complained of,'" such that it is "trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* at 111 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Although it acknowledged that the Attorney General's enforcement of the *Adobe Whitewater* decree injures the landowners, the district court held that this injury was actually traceable to the New Mexico Supreme Court's decree. *See* App. 178. This misunderstands the function and operation of prospective injunctive relief through *Ex parte Young*.

The *Young* principle is "necessary to 'permit the federal courts to vindicate federal rights.'" *Va. Off. for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984)). Because states cannot be sued in their own right in federal court, a citizen's ability to seek prospective relief from those who enforce state law in such a way as to deprive him of a federal constitutional right "gives life to the supremacy clause" and is "necessary to vindicate the federal interest in assuring the supremacy of [federal] law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Ultimately, it serves to

guarantee "a federal forum for claims of unconstitutional treatment at the hands of state officials." *Heck v. Humphrey*, 512 U.S. 477, 480 (1994).

*Young* works by permitting an aggrieved individual to "sue the individual state officials most responsible for enforcing the law in question and seek injunctive or declaratory relief against them." *Berger v. N.C. State Conf. of NAACP*, 597 U.S. 179, 184 (2022). Likewise, "the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007). The persons or entities with the authority to enforce the law are often not the same as those who *enact* the law. That is why an individual with a grievance against a state statute does not sue the state legislature or the legislators themselves who enacted it,[3] but rather the executive officials who enforce it. *See Frank v. Lee*, 84 F.4th 1119, 1135 (10th Cir. 2023) (individual had standing to sue Secretary of State and County Clerk who had "a sufficient connection to the enforcement of the challenged statute," a regulation of electioneering). After all, it would make little sense to sue the legislature for prospective relief when its action was in the past. It is the executive officials who are responsible for future action.

---

[3] In any case, the legislators themselves are absolutely immune from suit for their legislative activities. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998).

The same is true here. The threat of prosecution that the district court deemed sufficient to demonstrate an injury-in-fact came from the Attorney General, not the New Mexico Supreme Court. The state supreme court's action was entirely in the past, while this case is about the future. Ultimately, it is just as if the state legislature had decreed public rights across private streambeds—like the court, the legislature would not enforce such a decree on its own. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (*Young* "does not normally permit federal courts to issue injunctions against state-court judges or clerks" because "those individuals do not enforce state laws as executive officials might"). As here, it would fall to the Attorney General and the other named executive officials to enforce those rights. And so here, it is the named executive officials' enforcement that causes the landowners' prospective injury, not the past actions of the state supreme court.[4]

---

[4] To the extent *Pavlock v. Holcomb*, 35 F.4th 581 (7th Cir. 2022), holds otherwise, this Court should not follow it. However, the case is distinguishable. With respect to causation, the Seventh Circuit noted that "the Owners' complaint does not include any allegations showing that the state defendants' enforcement of [the judicial decree at issue] has caused any further injury that they have not already experienced as a result of the decision itself." *Id.* at 590. By contrast, the landowners here allege several concrete actions the state officials have taken to enforce *Adobe Whitewater*. *See* App. 017–18, 024–25, 029–30 (Complaint ¶¶ 15, 45–46, 61–62). The injury the landowners seek to cure is the ongoing threat of enforcement that was absent in *Pavlock*.

The district court seemed to understand that the landowners seek relief from enforcement actions,[5] but concluded that the officials aren't causing the landowners' injuries because "these actions simply reflect what the officials are constitutionally required to do." App. 178. Yet the entire reason for the *Young* doctrine—not to mention 42 U.S.C. § 1983 itself—is so that federal courts may enjoin state officials from *following state law* when it conflicts with a federal constitutional guarantee. *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (noting that the federal civil rights cause of action places the "federal courts between the States and the people, as guardians of the people's federal rights"). In our system of dual sovereignty, federal law reigns supreme, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI. That the New Mexico constitution might require the Attorney General to enforce public access to private streambeds does not render his enforcement immune from attack in federal court, if it deprives landowners of a property right without compensation. *See also infra* Part I.C.2.

In short, just as an individual might challenge a state statute by suing the secretary of state or another executive official, landowners here seek relief from executive officials' enforcement of state law. That the decree they're enforcing

---

[5] The district court's assertion in its causation section that "[t]he action or inaction of state officials has no bearing on [the landowners'] ability to exclude the public from their streambeds," App. 178, is best addressed under the framework of redressability, *see infra* Part I.B.

comes from the New Mexico Supreme Court does not render it any less a state law, nor does it change the causation analysis. Seeking prospective relief, the landowners properly attribute their injury to the officials' ongoing enforcement, not the state supreme court's nearly three-year-old order. The district court erred in holding that the landowners did not allege that the state officials' enforcement causes their injuries.

### C. Prospective Injunctive Relief Would Remedy the Landowners' Injuries by Restraining Enforcement of the *Adobe Whitewater* Decree

The district court went further off course in holding that prospective relief against the state officials would not redress the landowners' injuries. The court identified what it saw as a practical problem with the landowners' prayer for relief and a more theoretical one, but neither presents an obstacle to the landowners' standing to sue the state officials.

#### 1. Relief against the state officials would relieve a discrete injury the landowners are currently suffering

First, the practical issue. The district court concluded that prospective injunctive relief against the state officials would not redress the landowners' injury because members of the public would not be bound by any court order and would continue to have a state constitutional right to trespass on the landowners' streambeds. *See* App. 177. This misunderstands both the injury the landowners are seeking to redress and the requirements to demonstrate redressability. Put simply,

the landowners have sued the state officials to halt enforcement of the *Adobe Whitewater* decree because it is the state, not third party members of the public, which has taken their right to exclude. The redressable injury is the state officials' enforcement of that taking. That an order in the landowners' favor might not prevent future conflicts with nonparties does not doom Article III redressability.

To demonstrate redressability, a plaintiff need only show "that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Often, success in a lawsuit will not guarantee that a plaintiff achieves his ultimate goal, yet still it might bring concrete relief aiding in pursuit of that goal. For example, a developer who challenges local zoning restrictions can't guarantee that an injunction against enforcing the regulations will result in a successful housing development. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 261 (1977). But because the injunction would remove a barrier standing in the way of construction, it redresses a discrete injury the developer would otherwise suffer. *See id.* at 261–62; *see also Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007) (an order requiring EPA to regulate motor-vehicle emissions would redress the states' asserted injury "to some extent" even if it would not "by itself *reverse* global warming").

The injunction the landowners seek here is similar. To be sure, enjoining the state officials' enforcement actions might not prevent members of the public from asserting the *Adobe Whitewater* decree against the landowners. But it *would* prevent the state officials from assisting individuals who seek to take access to private streambeds. It would also allow the landowners to assert their right to exclude without fear of state penalties and enforcement actions like the lawsuits against Briones and Jenkins. What is more, the declaratory relief the landowners seek would establish that the officials effect a taking when they assert public rights over the landowners' private streambeds without offering compensation. So, while the relief the landowners seek might not render their right to exclude beyond any doubt against the world, it would certainly relieve a discrete ongoing injury by preventing the state officials from enforcing the newly-declared public rights.

Perhaps the most instructive case is *Consumer Data Industry Association v. King*, 678 F.3d 898 (10th Cir. 2012). That case dealt with a New Mexico law designed to protect victims of identity theft. *See id.* at 901. The law gave both the state Attorney General and the affected consumer a right to sue a violating consumer reporting agency for equitable and monetary relief. *Id.* A trade association challenged the law on the ground it was preempted by the federal Fair Credit Reporting Act. *Id.* It sought prospective injunctive relief prohibiting the Attorney General from enforcing the state law against its members. But, echoing the reasoning

below in this case, the district court held the association lacked standing because an order enjoining the Attorney General's enforcement would still leave the members "exposed to consumer-driven suits." *Id.* at 902. The district court found that "neither an injunction nor a declaratory judgment against the Attorney General" would redress the members' injuries because "in either case consumers could still bring private lawsuits in state court." *Id.*

This Court reversed. Emphasizing the Supreme Court's consistent instruction that Article III does not "demand complete redressability," this Court found that "restraining the Attorney General from enforcing" the law "would go a long way toward providing relief" for the association's members *Id.* at 902–03. Although the possibility of private suits meant that the members "would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires." *Id.* at 903 (quoting *Massachusetts*, 549 U.S. at 526). A favorable judgment for the landowners in this case would accomplish the same thing.

*King* then went even further, confining this Court's decision in *Nova Health Systems v. Gandy*, 416 F.3d 1149 (10th Cir. 2005), to its facts. In *Nova Health*, an abortion provider sought to challenge an Oklahoma statute that made such providers who perform an abortion on a minor without parental consent or notice liable for any subsequent medical costs incurred because of the abortion. *Id.* at 1153. The provider sought prospective injunctive relief against four state officials, but ran into a

causation problem because none of them were actively enforcing the statute against the provider. *See id.* at 1157. And while the defendants were state officials, they were not charged with enforcing the statute "on Oklahoma's behalf"—instead, they were simply among several individuals who *might* sue "in their proprietary capacities as directors of certain public medical institutions." *Id.* at 1158.

Though lack of causation was enough to destroy the provider's standing, the *Nova Health* panel went on to comment that any injunction against the four defendants would not redress the provider's injury because "there would still be a multitude of other prospective litigants who could potentially sue" the provider. *Id.* at 1159. The *King* panel specifically targeted this statement for clarification. *King* made clear that *Nova Health*'s reasoning does not apply where the Attorney General is sued to restrain his enforcement on behalf of the state. Because "[t]he Attorney General is the state's most powerful litigant" and "[h]is office has the resources to outlast private consumers and the manpower to prosecute dozens of cases at a time," restraining his enforcement of state law will typically redress injuries flowing from that law. *King*, 678 F.3d at 904. That is why, "[s]o long as the plaintiff faces a credible threat of enforcement, redressability is generally not an obstacle," even where private individuals might share some enforcement power. *Id.* at 905.

Indeed, even where an Attorney General lacks more traditional enforcement power, this Court has permitted suits to enjoin actions that contribute to a plaintiff's

injury. In *Chamber of Commerce of U.S. v. Edmondson*, an association of chambers of commerce sought to challenge an Oklahoma law forcing businesses to use a program verifying the work authorization status of their employees "on pain of debarment from contracting with Oklahoma public employers." 594 F.3d 742, 750 (10th Cir. 2010). Even though the state Attorney General argued he had no power to enforce the provision, this Court held that "the harms alleged by the Chambers will likely be 'reduced to some extent' by an injunction running against the Attorney General." *Id.* at 757 (quoting *Massachusetts*, 549 U.S. at 526). Nor was the fact that the injunction would not bind public employers—some of whom "might refuse to enter into contracts with businesses" that did not comply with the law—a barrier to redressability. *Id.* at n.16. On the contrary, *Edmondson* permitted the assumption that these employers "would abide by an authoritative interpretation of the . . . provision . . . even though they would not be directly bound by such a determination." *Id.* (quoting *Utah v. Evans*, 536 U.S. 452, 460 (2002)). The same might be said for the local sheriffs confronted with an authoritative declaration that continued enforcement of the *Adobe Whitewater* decree without compensation is unconstitutional. *Contra* App. 177 ("the public has other ways to preserve its constitutional right to recreate in public waters (for example, by court order or going to the local sheriff)").

These cases make clear that the potential for conflict with unbound individuals does not defeat redressability. So the landowners need not show that an order enjoining the state officials from enforcing the *Adobe Whitewater* decree would relieve every possible impediment to the exercise of their right to exclude trespassers. Because the Attorney General and the other state officials are actively enforcing the claimed public rights, the landowners may seek relief from that enforcement even if an injunction might not protect them from later disputes with private individuals. The district court's decision to the contrary echoes the analysis this Court thoroughly rejected in *King*. This Court should reject it again.

### 2. The district court's theory runs roughshod over the Supremacy Clause

Second, the district court's overarching theory on redressability misunderstands the nature of our system of dual sovereignty and the supremacy of federal law. At bottom, it seems to rest on the notion that a federal court is powerless to declare a provision of the state constitution unenforceable because state officials are bound by the state constitution. *See* App. 177 ("[T]he New Mexico Constitution itself forbids landowners from excluding members of the public from their streambeds."); App. 178 ("The action or inaction of state officials has no bearing on [the landowners'] ability to exclude the public from their streambeds."); App. 178 (officials' actions "reflect what the officials are constitutionally required to do"). But—as the landowners briefly explained in the context of causation—the state

constitution is subordinate to the United States Constitution. Granting prospective injunctive and declaratory relief is the primary way federal courts assert the supremacy of federal law over the constitution and laws of the states. *See Green*, 474 U.S. at 68.

The problem is particularly stark in this context. *Knick* guarantees property owners a federal forum to assert a takings claim against state actors. 588 U.S. at 194 ("[B]ecause a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time."). That is for good reason. The Takings Clause exists in part because the Framers recognized that property rights are especially vulnerable to majoritarian impulses. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 855 (1995). They designed it to "bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). But many state courts—including the New Mexico Supreme Court—are staffed by elected judges who "have ties to broader political coalitions" and are thus subject to the same impulses and at risk of bias towards their own state governments. Ilya Somin, Knick v. Township of Scott*: Ending a Catch-22 That Barred Takings Cases from Federal Court*, 2019 Cato Sup.

Ct. Rev. 153, 182. A federal forum thus serves as a layer of protection for constitutionally guaranteed property rights.

The district court's position effectively insulates states from federal court scrutiny in all takings cases. For example, suppose the legislature declared that an indisputably private tract of land now belonged to the state for the benefit of the public. Then suppose the landowner sought relief in federal court to halt the state officials' taking of his land—the traditional remedy for a taking before inverse condemnation became commonplace, *see Knick*, 588 U.S. at 200 ("Antebellum courts, which had no means of compensating a property owner for his loss, had no way to redress the violation of an owner's Fifth Amendment rights other than ordering the government to give him back his property."). Under the district court's theory, his case must be dismissed on redressability grounds because the state statute would still exist irrespective of the relief granted. And so the important federal remedy *Knick* secured would be illusory for this property owner, as it is for the landowners in this case.[6]

It does not have to be this way. Indeed, the district court's theory is inconsistent with how prospective relief functions in other contexts. Federal courts

---

[6] The same was true for the beachfront property owners in *Pavlock*. This Court should not follow *Pavlock*'s reasoning. But as noted above, even if it did, the active enforcement here contrasts with the lack of such allegations in that case. *See supra* n.4. The *Pavlock* decision can be explained by the lack of a discrete injury caused by an enforcement action, but that is not a problem here.

have *never* had the power to blue pencil state laws or state constitutions. *See California v. Texas*, 593 U.S. 659, 672 (2021) (noting that "[r]emedies . . . do not simply operate 'on legal rules in the abstract.'" (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 489 (2018) (Thomas, J., concurring)); *Murphy*, 584 U.S. at 489 (Thomas, J., concurring) ("courts do not have the power to 'excise' or 'strike down' statutes"). As such, *Young* doesn't license federal courts to delete sections of state law—only to restrain the enforcement of such law. Many state constitutions contain clauses that are either clearly or likely unconstitutional, yet remain on the books even though no state official could enforce them. *See* Maureen E. Brady, *Zombie State Constitutional Provisions*, 2021 Wis. L. Rev. 1063, 1067–69. The continued existence of a state constitutional provision even after relief is granted does not render that relief insufficient to redress a claimed injury.[7]

The landowners allege that the Attorney General and the other state officials are actively enforcing the *Adobe Whitewater* decree, subjecting the landowners to lawsuits and other enforcement actions if they try to assert their right to exclude the

---

[7] Here, the landowners do not even argue that the state constitution's public water clause is inconsistent with the federal Constitution. They only argue that if New Mexico wants to implement the broader public rights the *Adobe Whitewater* court now says the clause requires, it can only do so if it compensates the landowners for the taking. Any injunction could be dissolved upon the payment of just compensation. *See Cedar Point*, 594 U.S. at 179 (Breyer, J., dissenting) ("On remand, California should have the choice of foreclosing injunctive relief by providing compensation.").

public from their streambeds. As a result, they are entitled to seek redress against these actions in federal court. The existence of a state constitutional provision or a state supreme court decision is no barrier to a federal remedy for the unconstitutional enforcement of state law. To hold otherwise would privilege state law over federal constitutional rights.

* * *

To recount, the landowners have standing because (1) they've alleged an ongoing injury in the form of executive enforcement of a judicial decree that strips them of their right to exclude trespassers from their streambeds; (2) the threat comes from, and is thus caused by, the executive officials named as defendants; and (3) a favorable decision would extinguish the threat of enforcement. The landowners need not allege that the relief they seek will solve all of their problems relating to the right to exclude. It is enough that they have sought prospective injunctive and declaratory relief that would relieve *this* discrete injury. Therefore, the district court's dismissal for lack of standing should be reversed.

## II. Sovereign Immunity Does Not Bar the Landowners' Takings Claims

The district court also dismissed the landowners' complaint on sovereign immunity grounds. First, the court found that the relief the landowners seek would require the state to pay the landowners monetary damages. App. 181–84. And second, it held the complaint barred because the landowners failed to exhaust their

state-court remedies. App. 184–86. Neither of these were proper grounds for dismissal.

## A. The Landowners' Prayer for Prospective Relief Does Not Implicate the State Treasury

The first error flows from the same misunderstanding about *Young* and the Supremacy Clause that plagued the district court's standing analysis. The district court repeatedly says that it must "assume that executive officials have no choice but to continue enforcing the public's constitutional right to recreate in public waters" even if "this enforcement constitutes a taking." App. 180. It follows that, according to the district court, the only way to remedy the landowners' injury is through the provision of just compensation. The problem, of course, is that the state officials wouldn't have "no choice" but to continue enforcing *Adobe Whitewater*'s decree if *a federal court told them to stop*. Instead, they would have no choice but to stop enforcing it.

As described above, if a state constitutional provision conflicts with a federal constitutional guarantee, a federal court may enjoin state officials from enforcing the state constitutional provision. This is, again, the entire point of the Supremacy Clause and *Young*. *See Green*, 474 U.S. at 68. There is no shortage of examples of federal courts enjoining state officials from enforcing a state constitutional provision. Indeed, some are famous cases like *Obergefell v. Hodges*, 576 U.S. 644 (2015), which enjoined enforcement of three separate state constitutional provisions

restricting marriage to between one man and one woman.[8] And many states retain constitutional provisions a federal court would immediately enjoin if anyone tried to enforce them. *See* Brady, *Zombie State Constitutional Provisions*, *supra*, at 1067–69; *see also* Allan W. Vestal, *Removing State Constitution Badges of Inferiority*, 22 Lewis & Clark L. Rev. 1151, 1156–64 (2018). So to say that the Attorney General has *no choice* but to enforce public rights across the landowners' private streambeds is simply wrong. Even if he doesn't have a choice now, a federal court could order him to stop if it found enforcement without compensation violates the landowners' federal constitutional rights.

To be sure, just compensation is now the typical remedy for a taking. But prevailing law indicates that the state and its officials cannot be sued for inverse condemnation in federal court. And so, like the growers who prevailed in *Cedar Point*, the landowners come to federal court seeking the only remedy available— prospective injunctive and declaratory relief. There is no chance that this relief will impinge on the state treasury. If the landowners prevail, the state officials could *choose* to compensate the landowners so that they may go on enforcing the *Adobe Whitewater* decree in a manner consistent with the landowners' constitutional rights.

---

[8] The Supreme Court explained that the same-sex couples sought relief against constitutional provisions in Michigan, Kentucky, and Tennessee from "state officials responsible for enforcing the laws in question." *Id.* at 653–55.

*See supra* n.7. But the officials could also simply abide by the injunction and stop enforcing the decree, which would cost the state nothing.

The landowners chose not to seek monetary relief because it might trigger sovereign immunity. Instead, they seek only prospective injunctive and declaratory relief. Because a federal court is able to grant such relief without requiring any payment from New Mexico's treasury, the landowners' complaint falls within *Young* and does not implicate the state officials' sovereign immunity.

## B. The Landowners Do Not Have to Exhaust Remedies in State Court

The district court's second mistake is even further afield. According to the court, the landowners' claims are barred because "[t]he takings claim was not first brought in state court." App. 184. This indeed was the prevailing rule for many years after the Supreme Court's decision in *Williamson County*,[9] which reasoned that a violation of the Takings Clause was not complete until a state court denied a claim for just compensation. 473 U.S. at 194–95. But the Supreme Court rejected this reasoning in *Knick*, recognizing instead that "because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property

---

[9] Even under the *Williamson County* regime, at least one court suggested that the state-litigation requirement did not apply when a property owner sought prospective injunctive relief rather than just compensation. *See Levin v. City & Cnty. of San Francisco*, 71 F. Supp. 3d 1072, 1079 (N.D. Cal. 2014) (*Williamson County* ripeness "does not apply to takings claims that do not seek monetary compensation").

owner can bring a federal suit at that time." 588 U.S. at 194. As a result, the Court declared that "[t]he state-litigation requirement of *Williamson County* is overruled." *Id.* at 206. The district court's attempt to resurrect *Williamson County* must fail.

While the district court offhandedly acknowledged that *Knick* had overruled *Williamson County*, it went on to apply the state-litigation rule anyway. It faulted the landowners for not demonstrating that going to state court would be futile, or even that a futility exception exists in this Court. App. 184–85. But the landowners don't need a futility exception because the state-litigation requirement no longer exists. Whether or not this Court once had a futility exception to that requirement no longer matters because the landowners have a right to a federal forum under *Knick*.

The district court was perhaps misdirected by the landowners' citation of *Kolton v. Frerichs*, 869 F.3d 532, 535 (7th Cir. 2017), in a footnote in their brief below. *Kolton* was a pre-*Knick* case where the Seventh Circuit held that a property owner could bring a takings claim directly in federal court where the legal argument was identical to one that had already lost in the state's highest court. But the landowners did not cite *Kolton* to support an exception to the state-litigation requirement, *because that requirement no longer exists*. Instead, the citation was meant to bolster the landowners' argument that the state officials should not have immunity under *Coeur d'Alene*, 521 U.S. 261, because no effective state forum exists after *Adobe Whitewater*. *See* App. 124 & n.4. In making this argument, the

landowners drew an analogy to *Williamson County* futility cases—including this Court's decision in *North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021), which recognized a futility exception to *Williamson County*'s still-extant finality requirement. The landowners certainly did not intend to bring back the state-litigation requirement.[10]

*Coeur d'Alene* was an exceptional case involving a Tribe's attempt to use declaratory and injunctive relief under *Young* to deprive a state of sovereignty over a vast swath of territory. *See* 521 U.S. at 296 (O'Connor, J., concurring in the judgment) (the Tribe's suit sought to "divest the State of all regulatory power over submerged lands"). The five justices in the majority agreed that *Young* could not be invoked for such a sweeping purpose, but disagreed on much of the reasoning. Justice Kennedy, joined by Chief Justice Rehnquist, favored a "case-by-case approach to the *Young* doctrine" considering factors like whether the state courts were open to hear the case. *Id.* at 271, 274, 280 (opinion of Kennedy, J.). Justice O'Connor, joined by Justices Scalia and Thomas, favored a more straightforward approach. *See id.* at 296 (O'Connor, J., concurring in the judgment). The landowners

---

[10] The Seventh Circuit case the district court cites on the point of state courts being "open" to hear the case—*Gerlach v. Rokita*, 95 F.4th 493, 499 (7th Cir. 2024)—misses the mark for a different reason. The claims in *Gerlach* were barred because the property owner sought retrospective relief against state officials, something clearly outside the ambit of *Young*. *See id.*

sought to argue under both approaches—presenting the futility cases as a mark against *Coeur d'Alene* immunity under Justice Kennedy's approach.

Whether or not that argument is ultimately persuasive, it has nothing to do with whether the landowners had to go to state court to exhaust remedies. The law is clear that they did not. This Court should not be the first to resurrect *Williamson County*'s state-litigation requirement.

### C. The Officials Are Not Entitled to Sovereign Immunity Under *Coeur d'Alene*[11]

Finally, the officials are not entitled to sovereign immunity under *Coeur d'Alene*. *Coeur d'Alene* was an exceptional case involving a Tribe's attempt to have a federal court prohibit a state from exercising sovereignty over a vast swath of its land. Faced with this scenario, the Supreme Court recognized a narrow rule against the granting of such relief even when it falls within the technical confines of *Young*. But as both the Supreme Court and this Court have understood it, *Coeur d'Alene* does not apply outside the narrow confines of a contest between two sovereigns over sovereignty. It does not preclude the landowners from seeking a traditional *Young* remedy against state officials violating their constitutional rights.

---

[11] Whether *Coeur d'Alene* immunity bars the landowners' case was perhaps the central issue of the briefing in the district court. *See* App. 122–28. The court never reached it, but the landowners brief it here in case this Court has the occasion to reach it.

In *Coeur d'Alene*, the Tribe sued Idaho officials in federal court seeking relief truly breathtaking in scope, including a declaration establishing its "entitlement to the exclusive use and occupancy and the right to quiet enjoyment" of a large portion of submerged lands in Idaho as well as "the invalidity of all Idaho statutes, ordinances, regulations, customs, or usages which purport to regulate, authorize, use, or affect in any way the submerged lands." *Coeur d'Alene*, 521 U.S. at 265 (majority opinion). While the justices acknowledged that the Tribe had alleged an ongoing violation of federal law and sought prospective relief that would normally suffice to invoke *Young*, *see id.* at 281, a bare majority of the Supreme Court ultimately concluded that the Tribe's claim could not proceed. In the only part joined by all five members of the majority, the Court held that the Tribe's "unusual" suit was "the functional equivalent of a quiet title action which implicates special sovereignty interests," demanding a more complex inquiry into "the effect of the Tribe's suit and its impact on these special sovereignty interests." *Id.*

Ultimately the reason the Tribe could not invoke *Young* was because it asked a federal court to *divest a state of sovereignty*. These were the "special sovereignty interests" that led the Court to recognize a narrow exception to *Young*. *Id.* As the majority put it, the problem with the Tribe's suit was the "far-reaching and invasive relief the Tribe [sought], relief with consequences going well beyond the typical stakes in a real property quiet title action." *Id.* at 282. *Coeur d'Alene* implicated

"special sovereignty interests" not because the Tribe brought an ordinary takings case, but because it sought "a determination that the lands in question are not even within the regulatory jurisdiction of the State." *Id.* It was far from the typical claim where "state officials are found to have no right to possess a disputed parcel of land," *id.* at 290 (O'Connor, J., concurring in the judgment), as the Tribe instead sought to "divest the State of all regulatory power over submerged lands," *id.* at 296.

Subsequent Supreme Court precedent confirms that *Coeur d'Alene* does not apply outside this narrow context. First, in *Verizon Maryland, Inc. v. Public Service Commission*, the Court permitted a suit by a telecom company against members of a state commission to proceed under *Young*. 535 U.S. 635, 640 (2002). It rejected an appeal to special sovereignty interests, emphasizing instead that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring in the judgment)). Justice Kennedy joined the opinion, but wrote separately to explain that *Coeur d'Alene*'s result had been an outlier because the Tribe "tried to use *Ex parte Young* to *divest a State of sovereignty over territory within its boundaries*." *Id.* at 648 (Kennedy, J., concurring) (emphasis added).

The Court continued this trend in *Stewart*. That case defaulted to a traditional application of *Young* even where a state agency sued other state actors of the same state. Most importantly, *Stewart* reasoned that because a private party could have obtained the same relief as the agency, the relief could not possibly infringe on state sovereignty in the manner of *Coeur d'Alene*. *See* 563 U.S. at 257. This confirms that *Coeur d'Alene* has no application to a civil rights lawsuit brought by private landowners against state officials. *Coeur d'Alene* applies only to a contest between two sovereigns over sovereignty. Because the landowners do not—and could not—seek to deprive the state of sovereignty over their streambeds, the officials cannot claim *Coeur d'Alene* immunity.

Put simply, short of an attempt to have a federal court deprive a state of sovereignty, this Court "need not (and should not) linger over the question whether 'special' or other sorts of sovereign interests are at stake before analyzing the nature of the relief sought." *Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007); *see also Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 912 (10th Cir. 2008). In a typical takings case, "a government's assumption of title to property is no different from its assumption of any state authority that it may ultimately turn out not to have." *Coeur d'Alene*, 521 U.S. at 301 (Souter, J., dissenting). While that view did not carry the day in *Coeur d'Alene*, it should in a case that does not involve a dispute over sovereignty—or even over title. This Court should reject any attempt to expand

*Coeur d'Alene* immunity so that it protects state officials from traditional relief in a typical constitutional case.

## III.  The Landowners Have Properly Alleged an Uncompensated Taking[12]

The landowners allege that they hold title to the streambeds on their property and that these streambeds were recognized as private under state law until *Adobe Whitewater* declared public access in 2022. In fact, before 2022, all three branches of New Mexico government recognized that owners of non-navigable streambeds had the right to exclude trespassers. Eighty years ago, the New Mexico Supreme Court held that the state constitution's public water clause made even the water in the state's non-navigable streams open to the public for fishing. *See Red River Valley*, 182 P.2d at 430–31. But the court pointedly did not extend public rights to walking and wading on private streambeds. Instead, it emphasized that "no person has the right to approach public water through private property, or fish in public water while on private property without the consent of the owner." *Id.* at 464 (opinion denying motion for rehearing). Because the streambeds (unlike the water) are private property, the public had no right to walk or wade across them to fish, even though one could theoretically fish from a boat without trespassing. *See id.*

---

[12] The district court did not reach this question, but it was briefed below. *See* App. 132–36. If the Court finds that the landowners have standing and the officials do not have sovereign immunity, it should decide whether the complaint states a claim for relief rather than remanding for this determination.

The other branches followed suit. The Game Commission and Department of Game & Fish issued consistent guidance that streambeds were off limits without the consent of the owner. App. 022 (Complaint ¶¶ 35–36). Then the legislature enacted a law recognizing the landowners' right to exclude, and the Commission responded by promulgating a regulation that allowed streambed owners to have their properties certified and receive Department signage depicting that right. App. 022–23 (Complaint ¶¶ 37–39). But after *Adobe Whitewater*, the Commission and Department reversed course—it is now illegal to display the very signs that the Department itself issued only a few years ago. App. 024–25 (Complaint ¶ 45). The Attorney General, the Commission, and the Department are now enforcing public rights to walk and wade across the landowners' private streambeds—rights that did not exist until 2022. App. 017–18, 024–25, 029–30 (Complaint ¶¶ 15, 45–46, 61–62).

The deprivation of the landowners' right to exclude trespassers from their streambeds is a taking. Simply put, a state cannot "transform private property into public property without compensation." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980). That is what happened here. After *Adobe Whitewater*, New Mexico officials began enforcing public rights to trespass on private streambeds without compensating the landowners for taking what amounts to a public access easement. That is a taking just as much as if the state had declared

it had absolute title to the landowners' property—where the state takes an easement for the public, it destroys the right to exclude, "'one of the most treasured' rights of property ownership." *Cedar Point*, 594 U.S. at 149 (quoting *Loretto*, 458 U.S. at 435). It cannot accomplish this without compensating the landowners. *See id.* at 152. Because the landowners have not been compensated, the officials' enforcement is unconstitutional. *See Knick*, 588 U.S. at 194.

It does not matter that the officials are implementing a judicial decree. Below, the officials argued that the landowners' claim is a "judicial takings" claim—and that it is not cognizable on that basis. App. 089–91. But a "judicial taking" is not its own species of claim. As a unanimous Supreme Court recently explained, the Fifth Amendment "constrains the power of each 'State' as an undivided whole." *Sheetz v. El Dorado Cnty.*, 601 U.S. 267, 276 (2024). Therefore, "there is 'no textual justification for saying that the existence or the scope of a State's power to expropriate private property without just compensation varies according to the branch of government effecting the expropriation.'" *Id.* (quoting *Stop the Beach Renourishment, Inc. v. Florida Dep't of Env't Prot.*, 560 U.S. 702, 714 (2010) (plurality opinion)). The Takings Clause "constrains the government without any distinction between legislation and other official acts." *Id.* at 277.

In any event, the landowners do not seek relief against the *Adobe Whitewater* decree itself. So the Court need not deal with questions like whether one could

sustain a takings claim against a court. *Cf. Grove v. Groome*, 817 F. App'x 551, 557 (10th Cir. 2020). The landowners only seek to restrain enforcement of that decree, a traditional remedy through *Young*. Because the landowners have alleged that the officials are enforcing—without compensation—public rights that did not exist before 2022, the landowners have plausibly alleged a taking.

## CONCLUSION

For the reasons stated herein, the landowners respectfully ask this Court to reverse the judgment below and remand the case for further proceedings.

## ORAL ARGUMENT STATEMENT

The landowners request oral argument because this case presents important questions of first impression in the areas of Article III standing, sovereign immunity, and takings law. The landowners believe the Court would benefit from oral argument to resolve these difficult questions.

DATED: March 10, 2025.

Respectfully submitted,

CHRISTOPHER M. KIESER
JEREMY TALCOTT
MARK L. ISH

By: /s/ Christopher M. Kieser
    CHRISTOPHER M. KIESER
*Attorneys for Plaintiffs – Appellants*

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B):

[x]  this document contains 10,998 words, or

[ ]  this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x]  this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman font, or

[ ]  this document has been prepared in a monospaced typeface using _____ with _____.

Date: March 10, 2025.          /s/ Christopher M. Kieser
                               CHRISTOPHER M. KIESER
                               Pacific Legal Foundation
                               555 Capitol Mall, Suite 1290
                               Sacramento, California 95814
                               Telephone: (916) 419-7111
                               CKieser@pacificlegal.org

                               *Attorney for Plaintiffs – Appellants*

# ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO
_____

LUCIA F. SANCHEZ; MICHAEL F.
SANCHEZ JR.; ERIK BRIONES;
RICHARD JENKINS; and ROLAND
RIVERA,

          Plaintiffs,

v.                                                      No. 24-cv-00646-KWR-LF

RAUL TORREZ, in his official capacity as
Attorney General of New Mexico; RICHARD
STUMP, in his official capacity as Chair of
the New Mexico State Game Commission;
SHARON SALAZAR HICKEY, in her
official capacity as Vice-Chair of the
New Mexico State Game Commission;
TIRZIO LOPEZ, in his official capacity as a
member of the New Mexico State Game
Commission; GREGG FULFER, in his
official capacity as a member of the
New Mexico State Game Commission;
DR. SABRINA PACK, in her official
capacity as a member of the New Mexico
State Game Commission; EDWARD
GARCIA, in his official capacity as a member
of the New Mexico State Game Commission;
FERNANDO CLEMENTE JR., in his official
capacity as a member of the New Mexico
State Game Commission; and MICHAEL
SLOANE, in his official capacity as Director
of the New Mexico Department of Game &
Fish,

          Defendants.

<u>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**</u>

THIS MATTER comes before the Court upon Defendants' motion to dismiss, Doc. 16. Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is well taken, and therefore, is **GRANTED**. The case is dismissed without prejudice.

## BACKGROUND

The New Mexico Constitution declares that "[t]he unappropriated water of every natural stream . . . within the state of New Mexico . . . [b]elong[s] to the public and [is] subject to appropriation for beneficial use." N.M. Const. art. XVI, § 2. It is well settled that this provision protects the right to recreate and fish in public waters. *See State ex rel. State Game Comm'n v. Red River Valley Co.*, 182 P.2d 421, 428–29 (N.M. 1945).

In 2022, the New Mexico Supreme Court held that "the right to recreate and fish in public water also allows the public the right to touch the privately owned beds below those waters." *Adobe Whitewater Club of N.M. v. N.M. State Game Comm'n*, 519 P.3d 46, 49 (N.M. 2022). In its view, "[w]alking and wading on the privately owned beds beneath public water is reasonably necessary for the enjoyment of many forms of fishing and recreation." *Id.* at 53. It made clear, however, that "the public may neither trespass privately owned land to access public water, nor trespass on privately owned land from public water." *Id.*

Plaintiffs are property owners in San Miguel and Rio Arriba Counties. Compl. ¶ 4. Their properties include the streambeds of the Pecos and the Rio Tusas. Compl. ¶¶ 4, 10–14. These streambeds are among those subject to appropriation for public use.

After the *Red River* decision and until *Adobe Whitewater*, "[w]alking or wading across privately-held streambeds . . . was considered trespassing." Compl. ¶ 34. The New Mexico Game

2

Commission and Department of Game & Fish consistently affirmed that "the public had no right to walk or wade on privately-held streambeds." Compl. ¶ 35. In 2015, the state legislature enacted a law declaring that "[n]o person engaged in hunting, fishing, trapping, camping, hiking, sightseeing, the operation of watercraft or any other recreational use *shall walk or wade onto private property through non-navigable public water* or access public water via private property unless the private property owner or lessee or person in control of private lands has expressly consented in writing." N.M. Stat. Ann. § 17-4-6(C) (2015) (emphasis added). The Game Commission thereafter "issued a regulation that recognized each landowner's right to exclude the public from privately-owned streambeds." Compl. ¶¶ 38–39. *Adobe Whitewater*, however, rejected this understanding and removed the right to exclude trespassers from walking and wading on private streambeds.

After *Adobe Whitewater*, Defendants took steps to enforce the decision. The Game Commission repealed the regulation recognizing landowners' right to exclude the public. Compl. ¶ 45. The Department sent letters warning Plaintiffs that property owners must remove signage and anything restricting access to waters. Compl. ¶ 45. The Attorney General sued Plaintiff Briones in state court, alleging that their signage and fencing impermissibly restricted access to the Pecos River. Compl. ¶ 46. Attorney General Torrez's office also "announced that 'it is actively investigating allegations that several landowners continue to block access to rivers and streams in defiance of state law' and that 'it is prepared to take formal action to guarantee that all New Mexicans can access public waters for fishing and recreation.'" Compl. ¶ 61.

To date, the State has not brought an enforcement action against the Sanchez's, Jenkins, or Rivera. Compl. ¶ 47. Each Plaintiff, however, fears that enforcing their perceived right to exclude the public from their streambeds will be met with a state enforcement action. Compl. ¶¶ 47–49.

Plaintiffs now sue Defendants in their official capacities. Compl. ¶¶ 15–23. Defendants include: the Attorney General of New Mexico (Raul Torrez); the Chair and Vice-Chair of the New Mexico State Game Commission (Richard Stump and Sharon Salazar Hickey); members of the New Mexico State Game Commission (Tirzio Lopez, Gregg Fulfer, Dr. Sabrina Pack, Edward Garcia, and Fernando Clemente Jr.); and the Director of the New Mexico Department of Game & Fish (Michael Sloane). Compl. ¶¶ 15–23.

Plaintiffs bring their claims under the Fifth Amendment of the United States Constitution, alleging that Defendants took their property without paying just compensation. Compl. ¶¶ 60–66.[1] Plaintiffs seek a permanent injunction barring Defendants from taking future actions to prevent Plaintiffs from excluding trespassing from walking and wading on their private streambeds; a permanent injunction barring Defendants from penalizing Plaintiffs for excluding members of the public walking and wading on their private streambeds; and a declaratory judgment "that Defendants' assertion of public rights to walk and wade across Plaintiffs' private streambeds, as decreed in the . . . *Adobe Whitewater* decision, constitutes a per se taking of Plaintiffs' right to exclude." Compl. ¶¶ A–C.

Defendants thereafter moved to dismiss the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Doc. 16 at 3. As two bases for dismissal, Defendants assert that Plaintiffs lack standing and that Eleventh Amendment sovereign immunity bars suit. *See* Doc. 16 at 4, 15.

---

[1] No Plaintiff here was a party to *Adobe Whitewater* which, in addition to its holding interpreting the state constitution, held that its decision was not a taking. *See* 519 P.3d at 57.

## DISCUSSION

The Court must decide whether dismissal is proper under Federal Rules of Procedure 12(b)(1) or 12(b)(6). The Court finds that Plaintiffs' complaint insufficiently alleges subject matter jurisdiction, and therefore, the case must be dismissed. *See* Fed. R. Civ. P. 12(b)(1).

### I.    Legal Standard

Federal courts can dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction" or "(2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (citation omitted). Here, Defendants' Rule 12(b)(1) motion constitutes an attack on the facial sufficiency of the complaint's allegations as to subject matter jurisdiction, and as a result, the Court "presume[s] all of the allegations contained in the . . . complaint to be true." *Id.*

### II.    Analysis

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. In deciding whether a taking occurred, the Court is confronted with complex questions including whether to recognize a "judicial takings" theory, *see Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 715 (2010) (plurality opinion) ("If a legislature *or a court* declares that what was once an established right of private property no longer exists, it has taken that property . . . ." (emphasis added)), and whether a state court's interpretation of its constitution meets this standard. *See* Doc. 16 at 22; Doc. 22 at 20.

But the Court need not decide either question. Instead, the Court finds that it lacks jurisdiction over this case for two reasons. First, Plaintiffs cannot establish Article III standing. *See infra* section A. Second, Plaintiffs insufficiently allege that Eleventh Amendment sovereign immunity does not bar relief. *See infra* section B.  Accordingly, the Court must grant Defendants' motion to dismiss. *See* Fed. R. Civ. P. 12(b)(1).

A.  <u>Plaintiffs lack standing to seek a permanent injunction against the named state executive officials</u>.

The Court finds that Plaintiffs lack standing to enjoin the named state officials from enforcing the New Mexico Supreme Court's decision in *Adobe Whitewater* without providing compensation. "Article III standing requires the plaintiff to 'have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The party invoking federal jurisdiction has the burden of establishing standing separately for each form of relief sought. *See WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012); *Spokeo*, 578 U.S. at 338.

The Court finds that all Plaintiffs suffered an injury in fact because each "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Though some Plaintiffs have not yet faced an adverse action by the State, the Court finds that they may seek prospective relief against enforcement because each is confronted with a credible threat of prosecution. *See Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (explaining that a plaintiff "can sue for prospective relief against enforcement" so long as "he can show that he faces a 'credible threat of prosecution'"); *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."). Plaintiffs allege that "Attorney General Torrez's office has taken active steps to enforce the New Mexico Supreme Court's decree" against similarly situated landowners who do not permit public access to their streambeds, including Plaintiffs in this case. Compl. ¶¶ 15, 61. This presents a sufficiently credible threat of prosecution to justify prospective relief.

Plaintiffs, however, cannot meet standing's remaining requirements. First, Plaintiffs cannot demonstrate that an injunction is likely to redress their injury. *See WildEarth*, 690 F.3d at 1182. Second, Plaintiffs cannot show that their injury is "fairly traceable to the challenged conduct of the defendant." *See Baker*, 970 F.3d at 871. As a result, the Court lacks jurisdiction to grant the relief sought. *See Lujan*, 504 U.S. at 559–60; *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).

## 1. Plaintiffs' injuries are not redressable through prospective injunctive or declaratory relief.

Plaintiffs cannot demonstrate that it is likely their injury will be redressed by a favorable decision. *See Baker*, 979 F.3d at 871. "To demonstrate redressability, a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth*, 690 F.3d at 1182 (citation and internal quotations omitted). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Id.* (citation and internal quotations omitted). "A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement . . . ." *Id.* (citation omitted) (emphasis original).

Plaintiffs seek an injunction restraining Defendants from maintaining the public right of access to (or, in Plaintiffs' view, preventing or penalizing their right to exclude trespassers from)

the streambeds on Plaintiffs' land without providing just compensation. Compl. ¶¶ A–C. In other words, Plaintiffs want to prevent state officials from enforcing the New Mexico Supreme Court's decision interpreting its constitution in *Adobe Whitewater*. This injunction, however, would not redress Plaintiffs' injury. *See Lujan*, 504 U.S. at 568–69.

The New Mexico Constitution guarantees to the public a right to recreate in public waters, which includes the streams touching Plaintiffs' property. N.M. Const. art. XVI, § 2; *Red River*, 182 P.2d at 225–26. In *Adobe Whitewater*, the New Mexico Supreme Court explained that this right includes a "privilege to do such acts as are reasonably necessary to effect the enjoyment of such right, and that incident to this guarantee is the right to "walk[] and wad[e] on privately owned [streambeds]." 519 P.3d at 53. Accordingly, the New Mexico Constitution itself forbids landowners from excluding members of the public from their streambeds.

Even if the Court were to grant this relief against State officials and the officials were to cease its enforcement, the public would still have a right to access privately-owned streambeds and Plaintiffs would continue to lack both compensation and a legal remedy to restrict public access.[2] Furthermore, even if State executive officials decided to forego enforcing state law themselves and the landowners were to subsequently impede public access to their streambeds, the public has other ways to preserve its constitutional right to recreate in public waters (for example, by court order or going to the local sheriff). Indeed, "non-enforcement will not change the content of the underlying law itself." *See Pavlock v. Holcomb*, 35 F.4th 581, 590 (7th Cir. 2022).

---

[2] Plaintiffs could argue that the State officials are compelled by their obligation to uphold the State's constitution to enforce the public's right to access these waters, and as a result, must compensate Plaintiffs for a taking (therefore remedying their injury). But if the Court were to assume that such executive action was compelled, the relief requested would run into other problems. *See infra* section B.1.

In short, Plaintiffs' injury—New Mexico's interference with their ability to exclude the public from their streambeds—can only be remedied by changing the law to the pre-*Adobe Whitewater* status quo. Absent constitutional amendment or the New Mexico Supreme Court reversing its position, landowners remain powerless to remove members of the public from their streambeds with or without executive enforcement, and therefore, their injury will remain.

### 2. *Plaintiffs' injury is not fairly traceable to Defendants' conduct.*

As established *supra*, Plaintiffs lack standing because they cannot demonstrate the redressability requirement. Plaintiffs also cannot establish standing's causation requirement, or that their injury is "fairly traceable to the challenged conduct of the defendant," *see Baker*, 970 F.3d at 871, and "not the result of the independent action of some third party not before the court," *see Lujan*, 504 U.S. at 560 (citation omitted) (cleaned up).

To reiterate, Plaintiffs lost their right to exclude the public from their private streambeds not because of any action taken by the state official defendants. Instead, their streambeds are open to the public because the New Mexico Supreme Court—an independent third party—decided that its constitution required it. *See Pavlock*, 35 F.4th at 590. The action or inaction of state officials has no bearing on Plaintiffs' ability to exclude the public from their streambeds. While Plaintiffs suggest that they are harmed by regulatory actions conducted in *Adobe Whitewater*'s stead, *see* Compl. ¶ 62, these actions simply reflect what the officials are constitutionally required to do. In other words, Defendants' enforcement will not cause any further injury not already incurred from the New Mexico Supreme Court's decision in *Adobe Whitewater*.

### B.  Eleventh Amendment sovereign immunity bars this suit.

As established above, the Court does not have jurisdiction because Plaintiffs cannot establish standing. Eleventh Amendment sovereign immunity also precludes this Court's

jurisdiction. *See Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 558 (10th Cir. 2000) ("[I]n substance, the Eleventh Amendment constitutes a bar to federal subject matter jurisdiction."); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature.").

"The Eleventh Amendment constitutionalizes the doctrine of state sovereign immunity." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021). It provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "This immunity extends to suits brought by citizens against their own state," including "suits against a state official in his or her official capacity." *Hendrickson*, 992 F.3d at 965 (cleaned up) (citations and internal quotations omitted). But "Eleventh Amendment immunity 'is not absolute.'" *Id.* (citation omitted). "Under the *Ex parte Young* exception, a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief." *Id.* (citations omitted).

Yet *Ex parte Young* remains the exception, not the rule. *See generally Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011) (*VOPA*) (explaining that the *Ex parte Young* exception is a legal fiction "rest[ing] on the premise . . . that when a federal court commands a state official to do *nothing more* than refrain from violating federal law, he is not the State for sovereign-immunity purposes." (emphasis added)); *Ruiz*, 299 F.3d at 1180 ("With certain limited exceptions, the Eleventh Amendment prohibits a citizen from filing suit against a state in federal court." (citation omitted)). Even if *Ex parte Young*'s technical requirements are met, sovereign immunity may still bar suit.

Two limitations are relevant here. First, sovereign immunity bars suits against state officials when the relief sought would "impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663, 666 (1974); *see also VOPA*, 563 U.S. at 256–57 ("*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . ."). Second, takings claims against states are barred by the Eleventh Amendment if "a remedy is available in state court" and is unexhausted. *See Williams v. Utah Dep't of Corrs.*, 928 F.3d 1209, 1213–14 (10th Cir. 2019). In short, the Court finds that these doctrines bar relief. *See generally Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 553 (4th Cir. 2014) ("[W]e note that every other court of appeals to have decided the question has held that the Takings Clause does not override the Eleventh Amendment.") (collecting cases); *Williams*, 928 F.3d at 1213 (rejecting the argument "that the Eleventh Amendment does not apply to Fifth Amendment takings claims").

   1. *The equitable relief sought would impermissibly require the payment of funds from the State's treasury.*

As discussed *supra* section A.1, enjoining state executive officials from enforcing the *Adobe Whitewater* decree does not redress the injury alleged because Plaintiffs would continue to lack the ability to exclude members of the public from their private streambeds with or without executive enforcement. But if we assume that executive officials have no choice but to continue enforcing the public's constitutional right to recreate in public waters and that this enforcement constitutes a taking (requiring compensation, and a result, remedying Plaintiffs' injury), the injunction effectively (and impermissibly) requires the payment of funds from the State's treasury.[3]

---

[3] "Every person elected or appointed to any office shall, before entering upon his duties, take and subscribe to an oath or affirmation that he will support the constitution of the United States and

"It is . . . well established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment." *Edelman*, 415 U.S. at 663. "[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the State itself." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). In other words, *Ex parte Young* "does not apply 'when the state is the real, substantial party in interest, . . . as when the 'judgment sought would expend itself on the public treasury or domain.'" *VOPA*, 563 U.S. at 255 (citing *Pennhurst*, 465 U.S. at 101); *see also Edelman*, 415 U.S. at 663. This remains the case regardless of "whether [a suit against state officials] seeks damages or injunctive relief." *Pennhurst*, 465 U.S. at 101–02; *see also VOPA*, 563 U.S. at 256–57 ("*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . ." (citing *Edelman*, 415 U.S. at 666)). Indeed, "the 'general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought.'" *VOPA*, 563 U.S. at 256 (citing *Pennhurst*, 465 U.S. at 107) (emphasis added).

The Court finds that the Eleventh Amendment bars Plaintiffs' takings claim because, if we assume that executive officials are bound to continue enforcing *Adobe Whitewater*'s constitutional decree, the injunctive and declaratory relief sought has the effect of requiring the payment of funds from New Mexico's treasury. Plaintiffs' relief requires the Court to hold that the named state executive officials' enforcement of *Adobe Whitewater* is a taking. *See* Compl. ¶¶ A–C. When a taking occurs, the constitution requires states to provide "just compensation." U.S. Const. amend. V. Accordingly, if the state officials, acting in their official capacity, continue to enforce *Adobe*

---

the constitution and laws of this state, and that he will faithfully and impartially discharge the duties of his office to the best of his ability." N.M. Const. art. XX, § 1.

*Whitewater* after the Court grants the relief requested, New Mexico must compensate Plaintiffs. It seems clear, therefore, that the effect of "obtain[ing] an injunction" in this case is to "require[e] the payment of funds from the State's treasury." *See VOPA*, 563 U.S. at 256–57.

This conclusion, though previously unaddressed in the Tenth Circuit, best follows sovereign immunity principles. It is well established that the *Ex parte Young* exception is not inapplicable simply because the equitable relief granted has some effect on a state's treasury. *See Edelman*, 415 U.S. at 667–68 ("*Ex parte Young* was not totally without effect on the State's revenues . . . [l]ater cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young*."). To determine whether the effect on the state's treasury implicates sovereign immunity, courts have distinguished between injunctions granting prospective relief and those granting retroactive relief. *See, e.g.*, *id.* at 667–68 ("[T]he fiscal consequences to state treasuries in [cases rejecting claims of sovereign immunity] were the necessary result of compliance with decrees which by their terms were prospective in nature."); *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1390 (2021) (explaining that *Ex parte Young* is inapplicable to the takings claim at issue because "none of the relief Plaintiffs seek is prospective"); *Pharm. Rsch. and Mfgs. Of Am. v. Williams*, 64 F.4th 932, 950 (8th Cir. 2023) ("[W]hile the property owners in *Ladd* sought 'compensation for damage . . . *already caused*,' 971 F.3d at 581, [the plaintiff here] alleged that the takings are ongoing . . . ." (emphasis original)). Plaintiff relies on this distinction to evade sovereign immunity. *See* Doc. 22 at 9. But a closer look reveals that the dichotomy simply operationalizes broader sovereign immunity principles. *See generally Pennhurst*, 465 U.S. at 106 ("*Edelman*'s distinction between prospective and retroactive relief fulfills the underlying purpose of *Ex parte Young* while at the same time preserving to an important degree the constitutional immunity of the States.").

The grant of equitable relief for past conduct is impermissible because the state cannot un-ring the bell—that is, it has no chance to mitigate the exposure to its treasury resulting from its unconstitutional conduct. *See Edelman*, 415 U.S. at 668 ("While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State."). This reflects the founding principle that "States would remain immune from federal suit . . . absent their consent." *See Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (citing *Edelman*, 415 U.S. at 660, n.9). On the other hand, granting prospective equitable relief does not implicate the same sovereign immunity concerns because the state can avoid liability to the plaintiff(s) by changing how it operates going forward; in most cases, the monetary burden on the treasury comes from the state having to "shape their official conduct to the mandate of the Court's decrees," which results in only an "ancillary [and "often inevitable"] effect on the state treasury." *See Edelman*, 415 U.S. at 668. In other words, the overarching principle can be described as one of agency: is the monetary burden imposed on the state for constitutional violations unavoidable, or is the state free to alter its presently unconstitutional course of conduct to avoid liability in the future?

While the injunctive relief here is prospective in name, the cases referenced above—unlike the present case—do not discuss explicit state constitutional mandates. *Cf. Williams*, 64 F.4th at 950 (explaining that after granting injunctive relief, the state is afforded "the opportunity to repeal its law and reverse the unconstitutional taking"). If, as the Court assumes for this discussion, state executive officials are required to execute (and have no power to change) their state's constitutional commands (in other words, they *cannot* change their course of conduct to avoid a taking), the result more closely resembles that of retrospective equitable relief because it "is in

practical effect indistinguishable . . . from an award of damages against the State." *Edelman*, 415

U.S. at 668; *see also generally City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S.

687, 710–11 (1999) ("[J]ust compensation is, like ordinary money damages, a compensatory

remedy.").

In short, the Court concludes that granting the equitable relief requested under these

circumstances would impermissibly "impose a liability which must be paid from public funds in

the state treasury," and therefore, the Eleventh Amendment bars relief. *See Edelman*, 415 U.S. at

663.

  *2.  Plaintiffs' takings claim is barred because they did not exhaust state court remedies.*

The Eleventh Amendment bars Plaintiffs' claim for another reason: The takings claim was

not first brought in state court. *See Williams*, 928 F.3d at 1213–14 ("A claim under the Fifth

Amendment Takings Clause is barred by Eleventh Amendment immunity . . . as long as a remedy

is available in state court.") (collecting cases); *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton

Bank of Johnson City*, 473 U.S. 172 (1985) ("[I]f a State provides an adequate procedure for

seeking just compensation, the property owner cannot claim a violation of the Just Compensation

Clause until it has used the procedure and been denied just compensation."), *overruled in part by

Knick v. Township of Scott, Pa.*, 588 U.S. 180 (2019).[4] Recognizing this obstacle, Plaintiffs argue

---

[4] New Mexico courts provide ample takings remedies. *See* Doc. 28 at 14. New Mexico courts provide a forum for property owners to pursue takings claims. *See* N.M. Const. art. VI, § 13. Plaintiffs could have brought a federal takings claim in state court. *See Carter v. City of Las Cruces*, 915 P.2d 336, 338 (N.M. 1996) ("It is well settled that state and federal courts share concurrent jurisdiction over § 1983 claims for the denial of constitutional rights."). Furthermore, the New Mexico Constitution has a takings clause paralleling the United States Constitution. N.M. Const. art. II, § 20. New Mexico also recognizes and allows adverse condemnation proceedings in its courts. N.M. Stat. Ann. § 42A-1-29. The Supreme Court has recognized that an adverse condemnation cause of action is an adequate vehicle to pursue takings claims and receive just compensation. *See DeVillier v. Texas*, 601 U.S. 285, 293 (2024).

that the Eleventh Amendment's exhaustion requirement is excused in this case because pursuing

their takings claim in state court is futile. Doc. 22 at 12 n.4; *see Kolton v. Frerichs*, 869 F.3d 532,

535–36 (7th Cir. 2017) ("We do not read [the state court exhaustion requirement] to require resort

to state court when state law unequivocally denies compensation."). Namely, Plaintiffs point to

the *Adobe Whitewater* decision itself and its conclusion that no taking occurred. 519 P.3d at 57–

58.

     *Adobe Whitewater*, in addition to involving different parties, did not rule on the precise

takings question before this Court. In *Adobe Whitewater*, the New Mexico Supreme Court found

that no judicial taking occurred when it interpreted its state constitution to give "the public [a] right

to engage in such acts that utilize public water and are reasonably necessary for the enjoyment of

fishing and recreation." 519 P.3d at 57. In other words, *Adobe Whitewater* rejected a claim for

retroactive relief. Here, Plaintiffs only seek prospective injunctive and declaratory relief. *See* Doc.

22 at 13. In short, the takings question presented in this case has not yet been addressed by the

New Mexico Supreme Court.

     Plaintiffs also do not identify any controlling law applying the futility exception under

these circumstances. Indeed, the "critical issue . . . for purposes of determining whether state courts

are open to Takings Clause claims is whether state law recognizes a cause of action for a takings

claim," and "do not turn on whether a plaintiff is likely to succeed in federal court." *See Gerlach

v. Rokita*, 95 F.4th 493, 499 (7th Cir. 2024) (collecting cases). To this point, the Tenth Circuit

omitted any reference to futility when discussing whether an adequate takings remedy was

available in state court. *See Williams*, 928 F.3d at 1213–14. The Court also notes that enforcing

the exhaustion requirement does not foreclose federal court relief permanently; a takings claim can

be brought in federal court once Plaintiffs have "used the procedure and been denied just compensation." *See Williamson Cnty.*, 473, U.S. at 195.

The Court finds that Plaintiffs failure to exhaust state court remedies triggers Eleventh Amendment sovereign immunity, and therefore, bars relief.

## CONCLUSION

In sum, the Court finds that it lacks jurisdiction because Plaintiffs cannot establish Article III standing and Eleventh Amendment sovereign immunity bars relief. Accordingly, Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), Doc. 16, is **GRANTED**. The case is dismissed without prejudice.

It is **SO ORDERED**.

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE